FILED

2025 Mar-31  AM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| **KIMBERLY REED,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.4:24-cv-00096-MHH** |
| | } | |
| **LELAND DUDEK, ACTING** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,** [1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Kimberly Reed has asked the Court to review a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Reed's claims for a period of disability and disability insurance benefits based on an Administrative Law Judge's finding that Ms. Reed was not disabled. Ms. Reed argues that the Administrative Law Judge—the ALJ—did not properly evaluate the opinions of several consultative doctors. After review of the administrative record, for the

---

[1] On February 17, 2025, Leland Dudek became the Acting Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner Dudek as the defendant in this action. *See* FED. R. CIV. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time. . . .").

reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Reed had to prove she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[2]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm  (last  visited  Mar.  18, 2025).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Reed applied for a period of disability and disability insurance benefits on June 11, 2021. (Doc. 6-8, p. 2). Ms. Reed alleged that her disability began on May 10, 2021. (Doc. 6-8, p. 2). The Social Security Commissioner initially denied Ms. Reed's claims, and Ms. Reed requested a hearing before an Administrative Law Judge. (Doc. 6-5, pp. 13, 27-28; Doc. 6-6, pp. 3, 10, 19). Ms. Reed and her attorney attended a hearing with an ALJ on April 10, 2023. (Doc. 6-4, pp. 2-4).[3] A vocational expert testified at the hearing. (Doc. 6-4, pp. 19-24).

The ALJ issued an unfavorable decision on April 27, 2023. (Doc. 6-3, pp. 81-94). On November 22, 2023, the Appeals Council declined Ms. Reed's request for

---

[3] The ALJ indicated in her decision that she held a telephone hearing because of the COVID-19 pandemic. (Doc. 6-3, p. 81). The notices of the hearing indicated that the hearing would be by telephone on April 10, 2023, and Ms. Reed's attorney agreed to a telephone hearing. (Doc. 6-7, pp. 24, 34-35, 40). The transcript of the hearing indicates that the parties attended the hearing in person at the Social Security office in Birmingham, Alabama. (Doc. 6-4, p. 4; *see* Doc. 6-7, p. 14).

review, (Doc. 6-3, pp. 2-5), making the Commissioner's decision final and thus a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).[4]

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Reed's Medical Records*

To support her application, Ms. Reed relied on medical records relating to the diagnoses and treatment of depression, anxiety, panic disorder, and cervical spinal instability.  The Court has reviewed Ms. Reed's complete medical history and

---

[4] On June 19, 2023, Ms. Reed asked the Appeals Council to review the ALJ's unfavorable decision and asked for "60 days to submit additional evidence."  (Doc. 63, p. 56).  The Appeals Council gave Ms. Reed 25 days from June 21, 2023, or until July 16, 2023, to submit new and material evidence to the Appeals Council.  (Doc. 6-3, p. 50).  In a July 14, 2023 letter, Ms. Reed's attorney requested an additional 25 days, until August 8, 2023, to submit additional evidence.  (Doc. 6-3, p. 47).  Ms. Reed's attorney wrote:  "I will calendar this matter for August 8, 2023, unless I hear otherwise from your office." (Doc. 6-3, p. 47).  On August 8, 2023, Ms. Reed's attorney submitted to the Appeals Council additional evidence from Regional Clinic dated July 14, 2022 through May 4, 2023, Quality of Life Health Services dated February 15, 2023 through May 19, 2023, and Gadsden Regional Medical Center dated April 20, 2023 through June 13, 2023.  (Doc. 6-3, pp. 27-32, 61-77, 101-133; Doc. 6-4, pp. 27-37, 78-88).  The Appeals Council indicated that it received this additional evidence but did not rely on the evidence in its order because there was no reasonable probability that the evidence would change the decision.  (Doc. 6-3, p. 3).

On October 6, 2023, Ms. Reed's attorney submitted to the Appeals Council a mental medical source opinion from Dr. June Nichols.  (Doc. 6-3, pp. 11-27).  On October 19, 2023, Ms. Reed's attorney submitted to the Appeals Council medical records from American Family Care dated January 10, 2023 through March 2023.  (Doc. 6-3, pp. 9-10; Doc. 6-4, pp. 38-77).  The Appeals Council did not mention Dr. Nichol's opinion or the American Family Care records in its order denying review.  (Doc. 6-3, pp. 2-7).  Ms. Reed argues that the Appeals Council should have considered this late evidence.  (Doc. 11, pp. 23-29; Doc. 22, pp. 18-19).  In *Spurgeon v. Comm'r of Soc. Sec.*, No. 4:20-cv-00782-NAD, 2024 WL 1395258, *6 (11th Cir. April 2, 2024), the Eleventh Circuit found that the Appeals Council is not required to address untimely evidence submitted "past the deadline for new evidence."  *Spurgeon*, 2024 WL 1395258 at *6.

summarizes the following medical records because they are most relevant to this appeal.

*Mental Impairments*

On September 18, 2019, Ms. Reed saw CRNP Ivonne Joiner at Rainbow City CarePlus and reported that she stopped taking Wellbutrin for her anxiety because it made her "more 'angry.'"  (Doc. 6-18, pp. 50, 51).[5]  CRNP Joiner prescribed Cymbalta.[6]  (Doc. 6-18, p. 53). On January 8, 2020, Dr. Howard McVeigh at Rainbow City CarePlus refilled Ms. Reed's Cymbalta prescription.  (Doc. 6-18, p. 68). On July 2, 2020, Ms. Reed saw CRNP Kimberly Buckelew at Rainbow City CarePlus and reported increased anxiety and depression and daily crying spells. (Doc. 6-13, pp. 38-39).  She indicated that she was going through a "rough time with her husband" and had a "new grandchild in the home." (Doc. 6-13, p. 38).  Ms. Reed stated that she stopped taking Cymbalta because it caused manic anger episodes.

---

[5]  Wellbutrin is used to treat major depressive disorder and to prevent seasonal affective disorder. *See*       https://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last visited Mar. 18, 2025).

[6]  Cymbalta, whose generic name is duloxetine, is used to treat depression and anxiety, muscle pain and stiffness, and chronic pain related to muscles and bones.  *See* https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited Mar. 18, 2025).

(Doc. 6-13, p. 38). CRNP Buckelew prescribed Zoloft and refilled gabapentin. (Doc. 6-13, p. 40).[7]

On August 18, 2020, Ms. Reed saw CRNP Angela Garrard at Carr Mental Wellness and reported increased anxiety. (Doc. 6-14, p. 77). Ms. Reed stated that her 18-year-old daughter had had a baby and that Ms. Reed and her husband had been fighting. (Doc. 6-14, p. 77). Ms. Reed stated that she felt like she could not swallow, did not eat for fear she would choke, and had chest tightness and crying spells. (Doc. 6-14, p. 77). She indicated that she previously had been treated for bipolar but had not had "issues in a long time." (Doc. 6-14, p. 77).[8] Ms. Reed stated that Zoloft had decreased her panic attacks from two to three times a day to once a day. (Doc. 6-14, p. 77). Ms. Reed had an anxious mood and affect, no suicidal ideations, intact cognition, and good insight and judgment. (Doc. 6-14, p. 78). CRNP Garrard noted that Ms. Reed was easily distracted. (Doc. 6-14, p. 78). CRNP

---

[7] Zoloft, whose generic name is sertraline, "is used to treat depression, obsessive-compulsive disorder [], panic disorder, premenstrual dysphoric disorder [], posttraumatic stress disorder [], and social anxiety disorder []." *See* https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited Mar. 18, 2025).

Gabapentin is used to treat seizures, nerve pain, and restless leg syndrome. *See* https://www.health.harvard.edu/staying-healthy/gabapentin-uses-side-effects-and-what-you-should-know-if-youve-been-prescribed-this-medication (last visited Mar. 18, 2025).

[8] In 2013, Dr. Linda Morris at Gadsden Regional Medical Center noted Ms. Reed's past medical history of bipolar disorder. (Doc. 6-17, pp. 11, 14).

Garrard diagnosed generalized anxiety disorder and mood affective disorder, prescribed Buspar, and increased Ms. Reed's dosage of Zoloft. (Doc. 6-14, p. 78).[9]

At a September 15, 2020 visit with CRNP Garrard, Ms. Reed reported "recurrent severe panic attacks," anxiety, and depression. (Doc. 6-14, p. 75). Ms. Reed stated that she could not tolerate Zoloft because it made her drowsy. (Doc. 6-14, p. 75). Ms. Reed reported that taking care of her grandson helped her anxiety. (Doc. 6-14, p. 75). CRNP Garrard prescribed Prozac to address Ms. Reed's emotional dysregulation, depression, and anxiety and continued Klonopin as needed. (Doc. 6-14, p. 76).[10] At a September 21, 2020 visit with CRNP Joiner at Rainbow City CarePlus, Ms. Reed reported that she saw Dr. Carr for anxiety and that she took Prozac and Klonopin. (Doc. 6-13, p. 34).[11] Her mental examination was normal. (Doc. 6-13, p. 36). CRNP Joiner discontinued Zoloft. (Doc. 6-13, p. 37).

On October 6, 2020, Ms. Reed saw CRNP Garrard and complained of depression, anxiety, decreased energy, irrational fears, and "recurrent severe panic

---

[9]  Buspar "is used to treat certain anxiety disorders or to relieve the symptoms of anxiety [but] usually is not used for anxiety or tension caused by the stress of everyday life." *See* https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last visited Mar. 18, 2025).

[10]  Prozac, whose generic name is fluoxetine, is used to treat depression, obsessive-compulsive disorder, and panic disorder. *See* https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last visited Mar. 18, 2025).

[11]  Klonopin, whose generic name is clonazepam, can be used to treat panic disorder. *See* https://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited Mar. 18, 2025).

attacks." (Doc. 6-14, p. 72). She reported that her anxiety was better because she quit her job which reduced her stress, but her unemployment put a financial strain on her family. (Doc. 6-14, p. 72). CRNP Garrard continued Prozac and Klonopin and noted that Dr. Carr would need to evaluate Ms. Reed's need for Klonopin at the next appointment. (Doc. 6-14, p. 73). At a visit with CRNP Garrard on October 15, 2020, Ms. Reed reported increased anxiety, depression, panic attacks, and trouble sleeping. (Doc. 6-14, p. 69). Ms. Reed stated that she felt like she was going to have a nervous breakdown. (Doc. 6-14, p. 69). Ms. Reed stated that Klonopin did not work. (Doc. 6-14, p. 69).

At an April 14, 2021 visit with CRNP Garrard, Ms. Reed reported that things had been better, and she had more good days than bad. (Doc. 6-14, p. 66). Ms. Reed stated that she was starting a new job with a cleaning service on May 3, 2021. (Doc. 6-14, p. 66). CRNP Garrard indicated that Ms. Reed's anxiety symptoms included "apprehensive expectation[], autonomic hyperactivity[], persistent irrational fears[], [and] recurrent severe panic attacks" and that her depression symptoms included decreased energy and feelings of guilt or worthlessness. (Doc. 6-14, p. 66). Ms. Reed reported that her sleep was "up and down," but she managed, and she "care[d] for her grandson all the time[,] but he [was] the best thing that ha[d] happened to her and [kept] her going." (Doc. 6-14, p. 66). CRNP Garrard noted that Ms. Reed tolerated her medications well and continued Prozac and Klonopin. (Doc. 6-14, p.

67).  At a May 10, 2021 visit with Dr. McClellan, Ms. Reed reported anxiety and "mental and emotional difficulty."  (Doc. 6-13, pp. 76-77).  On May 11, 2021, Ms. Reed saw CRNP Buckelew and reported that she took Klonopin and Prozac for panic attacks.  (Doc. 6-13, p. 83).

At a July 1, 2021 visit with CRNP Garrard and Dr. Carr, Ms. Reed reported that she was not doing well, had constant pain after a car accident, did not sleep well, was stressed financially, lost her home, and was staying with a friend.  (Doc. 6-13, p. 63).  Ms. Reed stated she felt like her "world [was] crashing," and "she [could] not stop it." (Doc. 6-14, p. 63).  She indicated she was not suicidal, but "if she didn't wake up that would be ok with her."  (Doc. 6-14, p. 63).  Ms. Reed's anxiety symptoms included "irrational fears" and "recurrent severe panic attacks."  (Doc. 6-14, p. 63).  She had an anxious and depressed mood and affect but an otherwise normal mental examination.  (Doc. 6-14, pp. 63-64).  CRNP Garrard and Dr. Carr increased Ms. Reed's dosages of Prozac and Klonopin to address her emotional dysregulation, anxiety, and depression.  (Doc. 6-14, pp. 64-65).  On July 13, 2021, Ms. Reed saw Dr. Dennis Doblar at Cherokee Pain Management and complained of panic attacks and trouble sleeping.  (Doc. 6-14, p. 13).

At an August 19, 2021 visit with CRNP Garrard and Dr. Carr, Ms. Reed complained that she was not doing well, had increased depression and anxiety, and did not sleep well.  (Doc. 6-14, pp. 60-61).  Ms. Reed stated that she was not

working, had financial stress, and had moderate improvement with her medications. (Doc. 6-14, p. 60). She reported "irrational fears" and "recurrent severe panic attacks." (Doc. 6-14, p. 60). Ms. Reed had an anxious and depressed mood and affect, intact cognition, normal attention span, and good insight and judgment. (Doc. 6-14, pp. 60-61). She had "thoughts of not waking up." (Doc. 6-14, p. 61). CRNP Garrard and Dr. Carr diagnosed generalized anxiety disorder and mood affective disorder. (Doc. 6-14, p. 61). At a visit with CRNP Joiner on September 24, 2021, Ms. Reed stated she was emotional and that her psychiatric pain medications did not work well. (Doc. 6-15, p. 49). CRNP Joiner advised Ms. Reed to see her psychiatrist for medications. (Doc. 6-15, p. 49).

At a November 11, 2021 visit with CRNP Garrard, Ms. Reed reported that she had been doing "somewhat better" until she ran out of medications, did not sleep well, and got upset over small things. (Doc. 6-19, p. 71). Ms. Reed's depression symptoms included decreased energy and feelings of guilt and worthlessness; her anxiety symptoms included irrational fears and severe panic attacks. (Doc. 6-19, p. 71). She had an anxious and depressed mood and affect, thoughts of not waking up, intact cognition, normal attention span, and good insight and judgment. (Doc. 6-19, pp. 71-72). CRNP Garrard continued Prozac and Klonopin. (Doc. 6-19, p. 72).

At a February 10, 2022 visit, Ms. Reed saw CRNP Garrard and Dr. Carr and stated that her anxiety was worse, she had racing thoughts, she fought a lot with her

10

pregnant daughter, and she did not sleep well.  (Doc. 6-19, p. 74).  Ms. Reed indicated that she was worried that she would end up raising her daughter's second child because Ms. Reed was the "one that care[d] for the other child now."  (Doc. 6-19, p. 74).  Ms. Reed indicated she had the same depression and anxiety symptoms as before, including recurrent, severe panic attacks.  (Doc. 6-19, p. 74).  CRNP Garrard and Dr. Carr continued Prozac, increased Ms. Reed's Klonopin dosage and prescribed "benzo" to address Ms. Reed's emotional dysregulation and anxiety. (Doc. 6-19, pp. 75-76).[12]

On April 29, 2022, in preparation for an epidural steroid injection, Ms. Reed reported to neurologist Dr. Robert Nesbitt that she had panic attacks.  (Doc. 6-15, p. 14).  On May 5, 2022, Ms. Reed saw CRNP Garrard and reported that "things [were] the same" and complained of "a lot of anxiety and panic attacks."  (Doc. 6-19, p. 77).  Ms. Reed stated that she knew that medications could "only do so much."  (Doc. 6-19, p. 77).  Ms. Reed reported that her daughter had had a baby and that she kept her grandbaby "all the time."  (Doc. 6-19, p. 77).  Ms. Reed reported that she fought with her daughter and husband over finances.  (Doc. 6-19, p. 77).  Ms. Reed had a

---

[12] "Benzo" is short for Benzodiazepine.  "Benzodiazepines are a class of medications that slow down activity in your brain and nervous system. They're most often used for treating anxiety and related mental health conditions, as well as brain-related conditions like seizures. These medications are tightly regulated and are only available with a prescription." https://my.clevelandclinic.org/health/treatments/24570-benzodiazepines-benzos (last visited Mar. 27, 2025).

depressed and anxious mood and affect but otherwise normal mental examination. (Doc. 6-19, p. 78).

At a July 28, 2022 visit, Ms. Reed stated that she was "ok" but had "medical issues." (Doc. 6-19, p. 80). Ms. Reed reported that that she was overwhelmed because her daughter and her daughter's boyfriend fought often, but Ms. Reed felt like she was "handling all pretty well." (Doc. 6-19, p. 80). CRNP Garrard noted that Ms. Reed was "positive" for nervousness and had an anxious and depressed mood and affect, that her depression symptoms included decreased energy and feelings of guilt or worthlessness, and that her anxiety symptoms included recurrent, severe panic attacks. (Doc. 6-19, p. 80).

At a visit with CRNP Garrard on January 11, 2023, Ms. Reed reported that she was "stressed all the time" and struggled financially because she could not work. (Doc. 6-19, p. 83). She could not eat and did not sleep well because of her anxiety. (Doc. 6-19, p. 83). Ms. Reed's anxiety symptoms included recurrent, severe panic attacks. (Doc. 6-19, p. 83). She had an anxious and depressed mood and affect, "thoughts of not waking up," intact cognition, average fund of knowledge, and good insight and judgment. (Doc. 6-19, p. 83-84). At a March 29, 2023 visit, Ms. Reed reported that things were better, that she was "not as stressed," and that she slept better. (Doc. 6-19, p. 86). Ms. Reed stated that she kept her grandbabies, that her daughter lived with her and helped, and that she and her daughter were getting along

better.  (Doc. 6-19, p. 86).  CRNP Garrard noted that Ms. Reed had an anxious, depressed mood and affect but an otherwise normal mental examination.  (Doc. 6-19, pp. 86-87).  CRNP Garrard wrote that Ms. Reed's anxiety symptoms included recurrent, severe panic attacks.  (Doc. 6-19, p. 86).  On May 26, 2023, Ms. Reed complained of panic attacks to Dr. Vinay Juneja at Gadsden Regional Medical Center emergency department.  (Doc. 6-3, p. 13).  She reported that she took Prozac and Klonopin.  (Doc. 6-3, p. 130).

### Physical Impairments

In June 2013, Ms. Reed saw Dr. Linda Morris at Gadsden Regional Medical Center and complained of back pain that she rated at 8/10.  (Doc. 6-17, pp. 11-14).  Dr. Morris diagnosed acute muscle spasm, acute low back pain, and acute lumbar myofascial strain.  (Doc. 6-17, p. 12).  A lumbar spine x-ray was unremarkable.  (Doc. 6-17, p. 16).  Ms. Reed's medications included cyclobenzaprine, ibuprofen, and Tramadol.  (Doc. 6-17, p. 13).[13]  In July 2017, Ms. Reed fell at work and

---

[13]  Cyclobenzaprine, whose brand name is Flexeril, "is used to help relax certain muscles in [the] body" and "relieve pain, stiffness, and discomfort caused by strains, sprains, or injuries to [] muscles."  *See*  https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Mar. 18, 2025).

"Ibuprofen is a nonsteroidal anti-inflammatory drug [] used to treat mild to moderate pain[] and helps to relieve symptoms of arthritis[], such as inflammation, swelling, stiffness, and joint pain."  *See*  https://www.mayoclinic.org/drugs-supplements/ibuprofen-oral-route/description/drg-20070602 (last visited Mar. 18, 2025).

"Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery. It is also used to treat pain severe enough to require opioid treatment and when other pain medicines

complained of back pain radiating down her legs that she rated at 9/10. (Doc. 6-17, pp. 26, 30). A lumbar spine x-ray was normal. (Doc. 6-17, p. 24). In August 2018, Ms. Reed saw Dr. Su Nguyen at Gadsden Regional Medical Center emergency department after a motorcycle accident. (Doc. 6-17, p. 35). Ms. Reed, a passenger on a motorcycle, flew off during the accident and landed on her "back/buttock." (Doc. 6-19, pp. 24-25). Ms. Reed reported moderate bilateral hip pain. (Doc. 6-17, pp. 35, 39). X-rays of her lumbar spine and pelvis were normal. (Doc. 6-17, pp. 31-34).

Ms. Reed went to Riverview Regional Medical Center the following day when her pain became worse. (Doc. 6-19, p. 25). Ms. Reed had tenderness and decreased range of motion and strength in her hips and tenderness, pain, and spasms in her lumbar back. (Doc. 6-19, p. 26). A CT of her pelvis and lumbar spine showed "minimally displaced left sacral ala fracture." (Doc. 6-19, pp. 11-14). Her medications included hydrocodone and ibuprofen. (Doc. 6-19, p. 33).[14]

In August 2018, Ms. Reed saw Dr. James Smith at Sparks Orthopedics and complained of numbness and tingling in her legs, difficulty walking, joint stiffness

---

did not work well enough or cannot be tolerated." *See* https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited Mar. 18, 2025).

[14] "Hydrocodone belongs to the group of medicines called opioid analgesics (pain medicines). It acts on the central nervous system (CNS) to relieve pain, and stops or prevents cough." *See* https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited Mar. 18, 2025).

and swelling, and back pain that she rated at 7/10.  (Doc. 6-16, pp. 81, 94).  Ms. Reed stated that her pain was worse when she walked long distances, moved, and bore weight.  (Doc. 6-16, p. 81).  Dr. Smith noted that Ms. Reed had "dysesthesia in L5 dermatome and dysesthesia in S1 dermatome" and a "severely left antalgic" gait.  (Doc. 6-16, pp. 81-82).[15]  Ms. Reed had 5/5 muscle strength in her legs and normal range of motion in her lumbar spine and hips.  (Doc. 6-16, pp. 81-82).  Her lumbar spine x-ray was unremarkable.  (Doc. 6-16, p. 82).  Dr. Smith recommended physical therapy, excused Ms. Reed from work until August 31, 2018, and limited her to "sitting work" like folding towels for six to eight weeks.  (Doc. 6-16, pp. 82, 84).

On March 15, 2019, Ms. Reed saw CRNP Richard West at Quality of Life and complained of restless leg syndrome and sleep apnea and rated her pain at 5/10.  (Doc. 6-11, pp. 5, 12-13).  Ms. Reed requested a gabapentin prescription because she was allergic to medications normally prescribed for restless leg syndrome.  (Doc. 6-11, p. 5).  CRNP West prescribed gabapentin and ordered a sleep study.  (Doc. 6-

---

[15] Dysesthesia is a burning, squeezing, crawling, or itching feeling "associated with radiculopathy pain."  *See*  https://www.medmastery.com/guides/neurology-diseases-clinical-guide/diagnosing-lumbar-radiculopathy (last visited Mar. 18, 2025).

"A dermatome is an area of skin supplied by a single spinal nerve. There are 31 pairs of spinal nerves, forming nerve roots that branch from your spinal cord, but only 30 dermatomes."  *See* https://www.healthline.com/health/dermatome (last visited Mar. 28, 2025).  "The L5 dermatome is an area of skin that receives sensations through the L5 spinal nerve and includes parts of the knee, leg, and foot."  *See* https://www.spine-health.com/conditions/spine-anatomy/all-about-l5-s1-lumbosacral-joint (last visited Mar. 18, 2025).  The S1 dermatome includes the "lower back, back of [the] thigh, back of [the] calf, and [the] last toe."  *See* https://www.healthline.com/health/dermatome (last visited Mar. 28, 2025).

11, pp. 12, 14).   In July 2019, Dr. Shahana Masood at Etowah Pulmonology Associates diagnosed obstructive sleep apnea syndrome but noted that Ms. Reed's treatment would be complicated because Medicaid did not pay for sleep-related equipment.   (Doc. 6-11, p. 40).   On August 15, 2019, Dr. Masood noted that Ms. Reed's August 9, 2019 sleep study was normal.   (Doc. 6-11, pp. 35-36, 44-49; Doc. 6-12, pp. 15-19; Doc. 6-13, pp. 2-3; Doc. 6-17, pp. 41-48).   Dr. Masood noted chronic obstructive lung disease.   (Doc. 6-11, p. 37).

Ms. Reed saw CRNP Joiner on August 21, 2019 and complained that gabapentin caused leg cramps at night.   (Doc. 6-18, pp. 43, 49).   She reported headaches, poor sleep, anger, and irritability.   (Doc. 6-18, p. 43).   Ms. Reed had normal range of motion in her spine, arms, and legs and a normal gait.   (Doc. 6-18, p. 45).   CRNP Joiner prescribed ropinirole.   (Doc. 6-18, p. 45).[16]

On September 18, 2019, Ms. Reed saw CRNP Joiner and complained of increased lower back pain because she was "doing more lifting with her job."   (Doc. 6-18, pp. 50, 56).   Ms. Reed reported that ropinirole did not help her leg pain.   (Doc. 6-18, pp. 50, 56).   Ms. Reed had bilateral lumbar spine tenderness to palpation; a positive left leg straight leg raise test; and normal range of motion in her spine, arms,

---

[16]   "Ropinirole tablets are also used to treat a condition called Restless Legs Syndrome (RLS). RLS is a neurologic disorder that affects sensation and movement in the legs and causes the legs to feel uncomfortable. This results in an overwhelming feeling of wanting to move your legs to make them comfortable." *See* https://www.mayoclinic.org/drugs-supplements/ropinirole-oral-route/description/drg-20066810 (last visited Mar. 18, 2025).

and legs.  (Doc. 6-18, p. 52).  A lumbar spine x-ray showed "[m]inimum rotatory scoliosis and minimal lower facet and SI joint DJD."  (Doc. 6-17, p. 57).[17]  CRNP Joiner prescribed methocarbamol and increased Ms. Reed's gabapentin dosage.  (Doc. 6-18, p. 53).[18]  Ms. Reed reported a previous fracture of her tailbone.  (Doc. 6-12, p. 11).  An October 25, 2019 x-ray of Ms. Reed's sacrum coccyx was normal.  (Doc. 6-12, pp. 11-12; Doc. 6-17, pp. 49-50).  A CT of Ms. Reed's head was normal.  (Doc. 6-12, p. 13; Doc. 6-17, p. 51).

A November 13, 2019 pulmonary function test showed that Ms. Reed had "[m]oderate obstructive defect with strong bronchodilator response consistent with a diagnosis of bronchial asthma."  (Doc. 6-11, pp. 41-42; Doc. 6-12, pp. 7-10; Doc. 6-17, pp. 53-56).  On December 16, 2019, Dr. Masood diagnosed Ms. Reed with asthma.  (Doc. 6-11, pp. 31, 33).

On January 8, 2020, Ms. Reed saw Dr. Howard McVeigh at Rainbow City CarePlus and complained of back pain.  (Doc. 6-18, p. 65).  Ms. Reed reported that

---

[17]  Rotatory scoliosis, or rotoscoliosis, is the "curvature of the vertebral column turned on its axis" and describes the "worst and most severe type of scoliosis.  Not only does the spine curve to the side, but the curve is also associated with a strong degree of rotation."  *See* https://www.njpaindoc.com/blog/everything-you-need-to-know-about-scoliosis (last visited Mar. 18, 2025).

Degenerative joint disease (DJD), often referred to as osteoarthritis, "happens when the cartilage that lines [the] joints is worn down over time and [the] bones rub against each other."  *See* https://my.clevelandclinic.org/health/diseases/5599-osteoarthritis (last visited Mar. 18, 2025).

[18]  Methocarbamol, whose brand name is Robaxin, "is used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions."  *See* https://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (last visited Mar. 18, 2025).

her muscle relaxers did not work. (Doc. 6-18, p. 65). Dr. McVeigh refilled Ms. Reed's prescription for gabapentin and discontinued ropinirole. (Doc. 6-18, p. 68). During an April 1, 2020 telehealth visit with Dr. McVeigh, Ms. Reed requested a gabapentin refill. (Doc. 6-18, p. 72).

Ms. Reed saw CRNP Joiner on February 6, 2021 and complained of lower back pain from lifting patients at work, nausea, and abdominal pain. (Doc. 6-13, p. 23). Ms. Reed noted that a prior fractured tailbone could be the cause of her pain and that muscle relaxers did not provide much relief. (Doc. 6-13, p. 23). Ms. Reed had pain and tenderness with palpation and normal range of motion her spine, normal range of motion in her arms and legs, and a normal gait. (Doc. 6-13, p. 25). Her mental examination was normal. (Doc. 6-13, p. 25). A lumbar spine x-ray showed "[l]umbosacral junction disc space narrowing." (Doc. 6-13, p. 26). CRNP Joiner prescribed Celebrex, discontinued naproxen, and recommended that Ms. Reed use a back brace for support at work. (Doc. 6-13, p. 26).[19] CRNP Joiner noted that she would order an MRI of Ms. Reed's lumbar spine if her condition did not improve. (Doc. 6-13, p. 26).

---

[19] Celebrex is a "nonsteroidal anti-inflammatory drug [] used to treat mild to moderate pain and help relieve symptoms of arthritis[], such as inflammation, swelling, stiffness, and joint pain." *See* https://www.mayoclinic.org/drugs-supplements/celecoxib-oral-route/description/drg-20068925 (last visited Mar. 18, 2025).

Ms. Reed saw CRNP Buckelew on February 22, 2021 and reported that her pain medications and Celebrex did not help her back pain. (Doc. 6-13, p. 19). CRNP Buckelew noted that Ms. Reed's x-ray showed narrowing at L5-S1, that she did not appear to have increased pain with range of motion, and that she had no radicular pain. (Doc. 6-13, pp. 19, 21). CRNP Buckelew's assessment included back pain without sciatica, chronic pain, and an "abnormal x-ray of the lumbar spine" that showed degenerative disc disease at L5-S1. (Doc. 6-13, p. 21). CRNP Buckelew ordered an MRI of Ms. Reed's lumbar spine, prescribed baclofen, and increased the gabapentin dosage. (Doc. 6-13, p. 21).[20]

On May 10, 2021, Ms. Reed was involved in a car accident in which the airbag deployed. (Doc. 6-13, pp. 15, 78). Ms. Reed saw CRNP Buckalew the day of the accident and complained of left hip, pelvic, and neck pain. (Doc. 6-13, pp. 15, 17). Ms. Reed had tenderness on the left side of her neck, normal range of motion in her neck, and mild bruising over her left hip. (Doc. 6-13, p. 17). CRNP Buckalew ordered x-rays of Ms. Reed's pelvis, hips, and cervical spine and re-filled her medications. (Doc. 6-13, pp. 17-18). On May 11, 2021, Ms. Reed returned to CRNP Buckelew and reported muscle, neck, and back pain; blurred vision; dizziness; and

---

[20] "Baclofen is used to help relax certain muscles in your body. It relieves the spasms, cramping, and tightness of muscles caused by medical problems, including multiple sclerosis or certain injuries to the spine." *See* https://www.mayoclinic.org/drugs-supplements/baclofen-oral-route/description/drg-20067995#:~:text=Back%20to%20top-,Description,certain%20injuries%20to%20the%20spine. (last visited Mar. 2025).

anxiety. (Doc. 6-13, pp. 11-12). Ms. Reed stated that she could not refill her Klonopin for a few days. (Doc. 6-13, p. 11). Ms. Reed reported that Celebrex and baclofen did not help her pain and that she took "[G]oody powders like candy." (Doc. 6-13, p. 11). CRNP Buckelew advised Ms. Reed that she could not take Goody's powder with Celebrex. (Doc. 6-13, p. 11). Ms. Reed had pain and soft tissue tenderness in her neck on the left, "some pain" with range of motion in her neck, and pain in her chest with deep breaths. (Doc. 6-13, p. 13). CRNP Buckelew administered a Toradol injection, discontinued baclofen, prescribed Flexeril, and recommended Tylenol or Motrin for pain. (Doc. 6-13, pp. 13-14).[21] Her cervical spine x-rays were unremarkable, and her left hip x-ray showed "[m]inimal lower facet DJD and likely minimal scoliosis." (Doc. 6-13, pp. 91-92). A May 21, 2021 lumbar spine MRI showed "disc desiccation with disc space narrowing," "broad-based disc bulge with superimposed central disc protrusion indenting the ventral thecal sac," mild canal narrowing, and mild to moderate right and mild left foraminal narrowing at L5-S1, with mild lumbar spondylosis greatest at L5-S1. (Doc. 6-12, pp. 5-6).[22]

---

[21]  Toradol is a nonsteroidal anti-inflammatory drug used short-term to treat moderate to severe pain. *See* https://www.drugs.com/toradol.html (last visited Mar. 16, 2025).

[22]  "Disc desiccation occurs when the tissues of the discs between the vertebrae become dehydrated. They may heal on their own, or surgery may be required to treat it." *See* https://www.medicalnewstoday.com/articles/322121 (last visited Mar. 18, 2025).

Following the May 10, 2021 car accident, Ms. Reed saw Dr. Michael McClellan at McClellan Chiropractic Clinic from May 10 to June 30, 2021. (Doc. 6-13, pp. 49-78). Ms. Reed reported muscle spasms in her back and neck and back, right shoulder, joint, and left hip pain; Dr. McClellan recommended home icing. (Doc. 6-13, pp. 49-56). At her May 10, 2021 initial visit, Ms. Reed reported moderate to severe pain in her neck, back, shoulders, arms, and hips. (Doc. 6-13, pp. 72, 75). She had decreased range of motion with pain in her cervical and lumbar spine, a positive cervical compression test, positive Kemp's and Braggard's tests, a positive Trendelenburg's test on the left side with severe pain, and tenderness in her spine and pelvis. (Doc. 6-13, pp. 67-70). Cervical spine x-rays on May 10, 2021

---

"A bulging disc is a condition in which the inner portion of the intervertebral disc begins to protrude from the outer wall of the disc. This condition usually develops over time and can cause other disc degeneration conditions, such as spinal stenosis. When a disc bulges in the lower back it is called a lumbar bulging disc, when the disc bulges in the neck area it is called a cervical bulging disc. [] A bulging disc may be a precursor to a herniated disc, or one which has partially or entirely broken through the outer wall of the intervertebral disc. Bulges can put pressure on the surrounding nerve roots, leading to pain that radiates down the back and other areas of the body depending on its location within the spinal column. If the symptoms are severe enough and have become chronic, surgery for a bulging disc may be required. About 90 percent of bulging disc cases occur in the lower back, the most common bulging disc location sits between lumbar vertebrae L4/L5 and between vertebrae L5/S1. The pressure on the nerves caused by th[e] bulges can put pressure on the sciatic nerve and lead to sciatica, causing leg pain and possible tingling, numbness, and weakness that originates in the lower back and travels through the buttock and down the large sciatic nerve in the back of the leg." *See* https://www.bonati.com/conditions/bulging-disc/ (last visited Mar. 18, 2025).

"Spondylolysis is a small crack between two vertebrae (the bones in your spine). Spondylolysis usually causes lower back pain. Most people don't need surgery to treat it. Rest, medication[,] and physical therapy are most successful when started early. . . ." *See* https://my.clevelandclinic.org/health/diseases/10303-spondylolysis (last visited Mar. 18, 2025).

showed "severe regional right-sided spinous rotation," "[m]oderate regional twisting to left lateral," and [i]nstability with stress during extension" at C2-3, C3-4, C4-5, and C5-6. (Doc. 6-13, p. 73). Thoracic spine x-rays showed "moderate regional listing to left lateral" and "[d]egenerative arthritis" at T6, T7, T8, T9, and T12. (Doc. 6-13, p. 73). Lumbar spine x-rays showed "[m]oderate disc space narrowing" at L1-2, L4-5, and L5-S1; "[m]oderate regional listing to right lateral"; "[m]oderate hypolordotic lumbar sagittal curvature"; "[m]oderate left-sided lumbar spinous rotation"; and a right and left pelvic deficiency. (Doc. 6-13, pp. 73-74). Dr. McClellan recommended three chiropractic sessions a week for four weeks and described Ms. Reed's prognosis as fair. (Doc. 6-13, p. 71).

At a visit on May 12, 2021 with Dr. McClellan, Ms. Reed stated that her constant, sharp neck pain radiated down her right arm and that her back pain radiated to her left buttock. (Doc. 6-13, p. 50). She stated that daily activities and "certain motions" aggravated her pain. (Doc. 6-13, p. 50). On May 13, 2021, Ms. Reed reported that her constant, sharp pain was more "towards her right shoulder and back" and made working difficult. (Doc. 6-13, p. 50). She could not clean a ceiling fan at work on May 14, 2021 because of pain. (Doc. 6-13, p. 50). On May 17, 2021, Ms. Reed described her neck, shoulder, and arm pain as constant and "breathtaking at times" and stated that her pain was worse with repetitive movements. (Doc. 6-13, p. 51). On May 19, 2021, she reported that she could not work because of pain.

22

(Doc. 6-13, p. 51).  At a visit on May 21, 2021, Ms. Reed stated she had moderate to severe pain when she rose from a seated or lying position.  (Doc. 6-13, p. 51).  On May 24, 2021, Dr. McClellan noted Ms. Reed's May 2021 MRI that showed disc bulging at L5-S1 and noted that he would "try lumbar compression" to relieve her pain.  (Doc. 6-13, p. 52).  Ms. Reed had decreased range of motion in her lumbar spine and left hip and muscle spasms in her neck.  (Doc. 6-13, p. 52).  Dr. McClellan noted on May 27, 2021 that because Ms. Reed reported pressure in her pelvis after decompression on May 24, he would "hold off on decompression" until Ms. Reed saw a neurosurgeon on June 23, 2021.  (Doc. 6-13, p. 52).  On May 28, 2021, Ms. Reed reported that she could not roll over in bed because of intense pain.  (Doc. 6-13, pp. 52-53).

At a June 1, 2021 visit with CRNP Joiner, Ms. Reed complained of back pain that radiated to her left side and neck pain that was worse with extension on her right side.  (Doc. 6-13, p. 7).  Ms. Reed stated that her pain woke her up at night, caused difficulty breathing at times, and caused discomfort because she could not roll over while sleeping.  (Doc. 6-13, p. 7).  Ms. Reed had reduced range of motion and pain with extension in her neck; inability to bend because of pain in her back; weakness with resistance, no tenderness, normal pulse, and normal range of motion in her right arm; weakness against resistance, reduced grip strength, no tenderness, and normal range of motion in her left arm; and normal range of motion and no joint pain in her

legs.  (Doc. 6-13, p. 9).  A June 3, 2021 cervical spine x-ray showed "[m]ild thoracic kyphosis and compensatory cervical lordosis," and "[m]inor facet DJD in the mid and lower cervical elements on the left."  (Doc. 6-17, p. 58).[23]  A thoracic spine x-ray showed "[m]inimal scoliosis and DJD with occasional mild disc space height loss."  (Doc. 6-17, p. 59).  CRNP Joiner diagnosed cervicalgia, radiculopathy of the thoracic and lumbar regions, and arm weakness.  (Doc. 6-13, pp. 9-10).  CRNP Joiner gave Ms. Reed a Toradol injection, prescribed tramadol and tizanidine, and discontinued cyclobenzaprine.  (Doc. 6-13, p. 10).[24]

At a June 1, 2021 visit with Dr. McClellan, Ms. Reed had 5/5 motor strength, could heel and toe walk, had decreased range of motion with dull pain in her cervical spine, thoracic and lumbar spine; 4/5 strength in her sternocleidomastoid muscle in her neck; a positive cervical compression test; a positive Kemp's test bilaterally with

---

[23]  "Kyphosis is an excessive forward rounding of the upper back." Mild kyphosis "causes few problems," but "[s]erious kyphosis can cause pain and be disfiguring."  *See* https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205  (last visited Mar. 2018).

"Lordosis develops if your spine curves too much and pushes your posture out of its usual alignment.  You might see lordosis that affects your lumbar spine called swayback."  *See* https://my.clevelandclinic.org/health/diseases/23908-lordosis (last visited Mar. 18, 2025).

[24]  "Tramadol is an opioid agonist that may be used to treat moderate to moderately severe chronic pain in adults."  *See* https://www.drugs.com/tramadol.html (last visited Mar. 16, 2025).

Tizanidine and cyclobenzaprine are used to help relax certain muscles in the body.  See https://www.mayoclinic.org/drugs-supplements/tizanidine-oral-route/description/drg-20066921 (last visited Mar. 16, 2025); https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Mar. 16, 2025).

moderate pain; and a positive Trendelenburg's test on the left side with mild pain. (Doc. 6-13, pp. 64-65).[25]    On June 4, 2021, Dr. McClellan wrote that he recommended that Ms. Reed continue with chiropractic care longer before she tried pain management.  (Doc. 6-13, p. 53).  Dr. McClellan noted on June 9, 2021 that Ms. Reed's report that her pain was worse each day was "somewhat confusing" because she was not active and did not work and because Dr. McClellan was "getting good movement when [Ms. Reed was] on the table."  (Doc. 6-13, p. 54).  Ms. Reed had decreased range of motion in her cervical and thoracic spine and left hip and moderate swelling in her lumbar spine.  (Doc. 6-13, p. 54).  Ms. Reed reported moderate to severe pain on June 10, 2021 and did not want chiropractic adjustment on June 11, 2021 because her pain was "really bad" that day.  (Doc. 6-13, p. 54).

---

[25]  A cervical compression test, also called the Spurling Test, is "designed to reproduce symptoms by compression of the affected nerve root.  The cervical extension is used to induce/reproduce posterior bulging of the intervertebral disk.  Rotation of the head causes narrowing of the neuroforamina in the cervical spine.  Finally, axial compression is applied to amplify these effects with the aim of exaggerating the preexisting nerve root compression."  "The test is considered positive when radicular pain is reproduced (pain radiates to the shoulder or upper extremity ipsilateral to the direction of head rotation)."  *See* https://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited Feb. 28, 2025).

The Kemp's test, also called the Quadrant test and Extension Rotation test, is "potentially useful in diagnosing facet joint pain" and "is typically described as having a patient perform extension combined with rotation of the spinal region of interest, with a positive test defined as a reproduction of the patient's pain."  *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC4139762/ (last visited Mar. 19, 2025).

"Trendelenburg sign is a physical examination finding seen when assessing for any hip dysfunction.  A positive Trendelenburg sign usually indicates weakness in the hip abductor muscles, which consists of the gluteus medius and gluteus minimus.  A contralateral pelvic drop during a single-leg stance defines a positive sign."  *See* https://www.ncbi.nlm.nih.gov/books/NBK555987/ (last visited Mar. 19, 2025).

On June 23, 2021, Ms. Reed saw Dr. Thomas Staner at Greystone Neurosurgery Clinic and complained of neck and back pain after the May 2021 car accident. (Doc. 6-13, p. 43). Ms. Reed reported that her pain was worse after seeing a chiropractor. (Doc. 6-13, p. 43). Dr. Staner indicated that Ms. Reed did not have radicular pain and noted Ms. Reed's May 2021 lumbar spine MRI. (Doc. 6-13, p. 43). Ms. Reed's physical examination was normal. (Doc. 6-13, p. 44). Dr. Staner diagnosed lumbar disc herniation, lumbar pain, neck pain with recent traumatic injury, and subscapular pain. (Doc. 6-13, p. 44). Dr. Staner wrote that he saw "no evidence for NS intervention." (Doc. 6-13, p. 45).[26] At her visit with Dr. McClellan on June 30, 2021, Ms. Reed reported that Dr. Staner only checked her leg reflexes, told her she did not need back surgery, and recommended pain management at his clinic. (Doc. 6-13, p. 56). Ms. Reed stated that Dr. Staner suggested she discontinue chiropractic care if it increased her pain. (Doc. 6-13, p. 56). Ms. Reed had decreased range of motion in her neck, back, and left hip; positive straight leg tests on both sides; and tenderness at C5-7, L3-5, and S1. (Doc. 6-13, pp. 58-60). Dr. McClellan recommended continued chiropractic care. (Doc. 6-13, p. 56).

---

[26] "Neuroendovascular [NS] intervention is a subspecialty that uses minimally invasive catheter-based technology, radiologic imaging, and clinical expertise to diagnose and treat diseases of the central nervous system, head, neck, and spine." *See* https://freida.ama-assn.org/specialty/neuroendovascular-intervention-ns (last visited Mar. 17, 2025).

On July 13, 2021, Ms. Reed saw Dr. Dennis Doblar at Cherokee Pain Management and complained of poor sleep and neck, back, and hip pain rated at 9/10. (Doc. 6-14, pp. 9, 12, 14, 33). Ms. Reed complained of muscle pain and weakness in her arms and legs and stiffness in her joints. (Doc. 6-14, pp. 12-13). She indicated that Tylenol and ibuprofen did not help her pain, that she had not taken gabapentin for one month, and that she would contact her doctor to taper off clonazepam. (Doc. 6-14, pp. 8-10, 17). Ms. Reed had pain with range of motion in her neck, back, hips, and knees. (Doc. 6-14, pp. 14-15). A nerve conduction test showed bilateral peroneal motor neuropathy. (Doc. 6-14, pp. 50-55). Dr. Doblar's impressions were neck, back, and left hip chronic pain and lumbago. (Doc. 6-14, pp. 15-16). Dr. Doblar indicated that physical examination findings, Ms. Reed's medical history, or referral documents supported his diagnosis of chronic pain. (Doc. 6-14, p. 16). Ms. Reed's drug screen was positive for hydrocodone, norhydroconde, gabapentin, fluoxetine, and nicotine, but negative for Tramadol which was prescribed. (Doc. 6-14, pp. 57-58).

At a July 21, 2021 visit with Dr. Doblar, Ms. Reed complained of neck, back, and left hip pain that she rated at 9/10. (Doc. 6-14, p. 3). Dr. Doblar noted that though Ms. Reed stated that she no longer took gabapentin, her drug screen was positive for gabapentin, and she tested positive for hydrocodone. (Doc. 6-14, pp. 6,

8).  Dr. Doblar refused to treat Ms. Reed and dismissed her from pain management because of inconsistent drug screens.  (Doc. 6-14, p. 6).

On September 7, 2021, Ms. Reed reported to CRNP Buckelew that she had been dismissed from pain management with Dr. Doblar, that she needed another pain management referral, and that she was told to contact Medicaid.  (Doc. 6-15, p. 57).  CRNP Buckelew's assessment included chronic pain and chronic headaches.  (Doc. 6-15, p. 59).  CRNP Buckelew prescribed topiramate for headaches.  (Doc. 6-15, p. 59).

On January 6, 2022, Ms. Reed saw CRNP Buckelew and complained of swelling in her feet.  (Doc. 6-15, p. 40).  On March 18, 2022, Ms. Reed saw Dr. Paul Clark at Neurosurgical Associates of Birmingham and complained of back pain that "radiate[d] down her entire [left] leg circumferentially in a nondermatomal pattern," loss of strength, joint swelling, numbness, and tingling.  (Doc. 6-14, pp. 88-89).  She rated her pain at 8/10.  (Doc. 6-14, p. 88).  Ms. Reed reported that she "tried chiropractor care, Goody's powders, [and] muscle relaxers without any relief of pain."  (Doc. 6-14, p. 88).  Ms. Reed had mild tenderness to palpation over her bilateral paraspinal muscles, 5/5 strength throughout, and a normal gait.  (Doc. 6-14, p. 90).  Dr. Clark noted that Ms. Reed's May 2021 lumbar spine MRI showed a central disc extrusion at L5-S1, but he did not "see any compression of nerve roots in either the lateral recess, foramen[,] or central canal."  (Doc. 6-14, p. 90).  Dr. Clark

28

indicated that he did not see a surgical option for Ms. Reed's pain, prescribed naproxen, and recommended physical therapy. (Doc. 6-14, p. 90). Dr. Clark noted that if Ms. Reed's condition did not improve, he would refer her to pain management for an epidural steroid injection. (Doc. 6-14, p. 90).

On April 29, 2022, neurologist Dr. Robert Nesbitt administered an epidural steroid injection in Ms. Reed's lumbar spine. (Doc. 6-14, pp. 97-98). Dr. Nesbitt's pre- and post-operative diagnoses included a herniated disc at L5-S1 and radiculopathy. (Doc. 6-14, p. 97). Ms. Reed's medications included gabapentin, Prozac, and Klonopin. (Doc. 6-15, pp. 12-13). Dr. Nesbitt noted that he hoped Ms. Reed could avoid surgery because of her young age, and he preferred to manage her pain "conservatively if possible." (Doc. 6-14, p. 97).

At a visit on May 19, 2022 with CRNP Joiner, Ms. Reed reported left foot pain after a fall. (Doc. 6-15, p. 36). A left foot x-ray was normal. (Doc. 6-15, pp. 39, 61). On June 16, 2022, Dr. Nesbitt administered another epidural steroid injection in Ms. Reed's lumbar spine. (Doc. 6-18, p. 9). Prior to the epidural, Ms. Reed reported pain at 8/10 to 9/10. (Doc. 6-18, p. 8). Dr. Nesbitt's pre- and post-operative diagnoses included a protruding lumbar disc, lumbar spondylosis, and mild central canal stenosis at L5-S1. (Doc. 6-18, p. 9). Dr. Nesbitt wrote that if Ms. Reed did not obtain relief from her pain after the epidural, he did "not have anything further to offer her." (Doc. 6-18, p. 9). On June 28, 2022, Ms. Reed saw CRNP

Joiner and complained of poor sleep and requested a sleep assessment. (Doc. 6-18, p. 81). CRNP Joiner's assessment included obstructive sleep apnea, low back pain, and muscle spasm. (Doc. 6-18, p. 84). CRNP Joiner noted that Medicaid did not approve Flexeril and that Ms. Reed could not afford her medications. (Doc. 6-18, p. 85). CRNP Joiner prescribed tizanidine in place of Flexeril. (Doc. 6-18, p. 85).

On August 2, 2022, Ms. Reed received another epidural steroid injection in her lumbar spine. (Doc. 6-18, pp. 24-25). Ms. Reed reported to Dr. Nesbitt that the prior epidural provided "50% relief," but her back pain became "significantly worse" and radiated to her legs. (Doc. 6-18, p. 24). Dr. Nesbitt's diagnosis before and after the injection included a protruding lumbar disc at L5-S1, ligamentum flavum hypertrophy, degenerative spondylosis of the lumbar spine, and lumbar radiculopathy. (Doc. 6-18, p. 24). X-rays of Ms. Reed's lumbar spine showed mild generalized spondylosis and "mild right convex scoliosis centered at the thoracolumbar junction." (Doc. 6-19, pp. 38-40). Dr. Nesbitt ordered an MRI of her lumbar spine but did not know if Medicaid would pay for the MRI. (Doc. 6-18, p. 24). CRNP Buckelew noted on August 3, 2022 that Ms. Reed's insurance would not pay for "[F]lexeril 5" so CRNP Buckelew prescribed cyclobenzaprine 10 mg and discontinued cyclobenzaprine 5mg. (Doc. 6-18, p. 89).[27]

---

[27] Flexeril is the brand name for cyclobenzaprine. *See* https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (last visited Mar. 19, 2025).

### *CRNP Angela Garrard's Mental Health Source Statements*

On July 1, 2021, at the request of Ms. Reed's attorney, CRNP Garrard completed a mental health source statement. (Doc. 6-13, p. 98). CRNP Garrard opined that Ms. Reed could not maintain attention, concentration, or pace for two hours; could not perform activities within a schedule and be punctual within ordinary tolerances; could not interact with supervisors and/or co-workers; would be off-task 20% of the time in an eight-hour workday in addition to normal breaks; and would be expected to miss two days of work a month because of her psychological symptoms. (Doc. 6-13, p. 98). CRNP Garrard indicated that Ms. Reed could understand, remember, or carry out short, simple instructions; could sustain an ordinary routine without special supervision; could adjust to routine, infrequent work changes; and could maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Doc. 6-13, p. 98). CRNP Garrard noted that Ms. Reed's medication side effects included drowsiness, irritability, and decreased reaction time. (Doc. 6-13, p. 98). CRNP Garrard wrote that Ms. Reed's "limitations existed back to 5/10/21." (Doc. 6-13, p. 98).

CRNP Garrard completed a second medical source statement on March 29, 2023 that included more limitations based on Ms. Reed's mental impairments. (Doc. 6-19, p. 70). CRNP Garrard opined that in addition to the limitations in the July 2021 statement, Ms. Reed could not sustain an ordinary routine without special

supervision, could not adjust to routine and infrequent work changes, would be off task 90% of the workday in addition to normal breaks, and would miss 12 days a month because of her psychological symptoms. (Doc. 6-19, p. 70). CRNP Garrard wrote that Ms. Reed's medication side effects included drowsiness, inability to drive, and immobility. (Doc. 6-19, p. 70).

### Dr. Jerry Bynum's Consultative Mental Examination

On November 30, 2021, at the Social Security Administration's request, Dr. Bynum reviewed Ms. Reed's medical records and examined her. (Doc. 6-14, pp. 80-83). Ms. Reed indicated that she repeated the fifth and sixth grades, that she quit school in the tenth grade to get married, and that she was in special education classes "all of [her] life through high school." (Doc. 6-14, p. 81). Ms. Reed stated that she had been married for 23 years, lived with her husband, and had two adult children. (Doc. 6-14, p. 81). She last worked for a house cleaning service. (Doc. 6-14, p. 81).

Regarding her daily activities, Ms. Reed stated that she went to bed at 10:00 to 11:00 pm, had trouble falling sleep, and sometimes slept until 2:00 to 3:00 pm. (Doc. 6-14, p. 82). She stated that she took care of her grandson during the day, was independent in basic self-care, did chores with her husband's assistance, had no social activities, had one friend, had a poor appetite, drove, and shopped with her husband's help. (Doc. 6-14, p. 82).

Ms. Reed reported that she had a "long history of anxiety and panic attacks that worsened after a motor vehicle accident." (Doc. 6-14, p. 80). She indicated that her psychiatric medications did not work. (Doc. 6-14, p. 80). Ms. Reed stated that she cried frequently, had trouble breathing, felt like she had something on her chest, and had a hard time being around people. (Doc. 6-14, p. 80). She reported that "prior to starting psychotropic medications," she had panic attacks daily, but the medications reduced the frequency of her panic attacks to "once to twice a month." (Doc. 6-14, pp. 80-81). Ms. Reed indicated that Prozac helped her mood. (Doc. 6-14, p. 81).

Dr. Bynum noted that Ms. Reed was neatly dressed and appropriately groomed and had normal speech, an "ok" mood, an euthymic affect, normal thought processes, average judgment, and intact memory. (Doc. 6-14, pp. 81-82). Ms. Reed calculated serial 7s, spelled the word "world" forward and backward, recalled 3/3 words after several minutes, recalled basic historical information without significant difficulty, had average abstraction skills, and could not name five large cities in the United States. (Doc. 6-14, pp. 81-82). Dr. Bynum estimated that Ms. Reed had low average intellectual functioning. (Doc. 6-14, p. 82).

Dr. Bynum diagnosed panic disorder without agoraphobia and moderate depressive disorder. (Doc. 6-14, p. 82). Dr. Bynum opined that Ms. Reed had mild limitation in her ability to communicate and to understand simple instructions and

perform familiar tasks.  (Doc. 6-14, p. 82).  Dr. Bynum opined that Ms. Reed had moderate limitation in her ability to understand complex instructions, perform novel tasks, follow understood instructions, cope with work stress, and interact socially in a work environment.  (Doc. 6-14, p. 82).  Dr. Bynum noted that Ms. Reed's "mental health symptoms [were] chronic with little change expected in the next 6 to 12 months."  (Doc. 6-13, p. 82).

### Dr. Gloria Roque's Mental Residual Functional Capacity Assessment

On December 2, 2021, at the request of the Social Security Administration, Dr. Roque reviewed Ms. Reed's medical records and evaluated her mental residual functional capacity.  (Doc. 6-5, pp. 10-12).[28]  Dr. Roque opined that Ms. Reed was not significantly limited in her ability to understand, remember, and carry out short, simple instructions; make simple work-related decision; ask simple questions or request assistance; maintain socially appropriate behavior; be aware of normal work hazards; and set realistic goals and make plans independently of others.  (Doc. 6-5,

---

[28]  On October 6, 2021, Dr. Roque reviewed Ms. Reed's medical records to evaluate her mental residual functional capacity.  (Doc. 6-5, pp. 3-4).  Dr. Roque stated:  "[Her] reading of the Carr MER [was] more suggestive of [moderate rather] than the severe limitations alleged in MSO statements.  MSO statements provide[d] no explanation or objective support for the ratings.  While the Carr MER indicate[ed] little improvement in anxiety [symptoms], [Ms. Reed] only followed once every 3 months.  Progress notes were unchanged in consistently stating 'feelings of guilt or worthlessness, decreased energy' and 'apprehensive expectation, autonomic hyperactivity, persistent irrational fears, and recurrent severe panic attacks' without indicating frequency of panic or diagnosing a panic disorder.  It looks like sections of the progress notes [were] cut and pasted from one session to the next.  [She] recommend[ed] obtaining a psych CE with MSE to more fully evaluate [Ms. Reed's] anxiety and depression and residual [symptoms]."  (Doc. 6-5, pp. 3-4).  Dr. Roque's December 2021 mental residual functional capacity assessment was after Dr. Bynum's November 2021 mental consultative evaluation.

pp. 10-11). Dr. Roque opined that Ms. Reed had moderate limitation in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work with others without distraction; maintain a consistent pace; interact appropriately with the general public and respond appropriately to supervisors; get along with co-workers or peers without distraction or exhibiting behavioral extremes; respond appropriately to changes at work; and travel to unfamiliar places or use public transportation. (Doc. 6-5, pp. 10-11).

Dr. Roque stated that:

> [Ms. Reed] could carry out simple instructions but would not consistently carry out detailed ones. She could sustain attention to simple, familiar tasks for two-hour periods in an 8-hour workday, utilizing all customary breaks. [Ms. Reed] would benefit from a flexible schedule due to sleep disturbance and would be expected to miss 1-2 days of work per month due to panic. [Ms. Reed] would benefit from casual supervision [and] a familiar, predictable work routine but should avoid[] close coordinated work with others, excessive workloads, rapid changes, and multiple demands. [Ms. Reed] would benefit from regular rest breaks and a slowed pace but would still be able be maintain an acceptably consistent work pace. [] Contact with the public should be non-intensive, limited. Feedback should be supportive, encouraging. Contact with a few familiar coworkers should be casual. [] The claimant could adapt to infrequent, well-explained changes.

(Doc. 6-5, p. 12).

### Dr. Amy Cooper's Mental Residual Functional Capacity Assessment

On May 6, 2022, at the request of the Social Security Administration, Dr. Cooper reviewed Ms. Reed's medical records and assessed her mental residual functional capacity. (Doc. 6-5, pp. 25-27). Dr. Cooper's mental residual functional capacity assessment mirrored Dr. Roque's assessment. (*Compare* Doc. 6-5, pp. 10-12 *with* Doc. 6-5, pp. 25-27).

### Dr. Krishna Reddy's Physical Residual Functional Capacity Assessment

On December 3, 2021, at the Social Security Administration's request, neurologist Dr. Reddy reviewed Ms. Reed's medical records and evaluated her physical residual functional capacity. (Doc. 6-5, pp. 9-10). Dr. Reddy opined that Ms. Reed could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk and sit with normal breaks for a total of six hours in an eight-hour workday; frequently could balance and climb ramps or stairs; could not climb ladders, ropes, or scaffolds; occasionally could stoop, kneel, crouch, and crawl; should avoid all work hazards and unprotected heights; and had no limitations in her exposure to extreme heat and cold, wetness, humidity, noise, vibration, and fumes. (Doc. 6-5, pp. 9-10).

### Dr. Russell March's Physical Residual Functional Capacity Assessment

On July 1, 2022, at the Social Security Administration's request, Dr. March reviewed Ms. Reed's medical records and Dr. Reddy's RFC findings and assessed

Ms. Reed's physical residual functional capacity. (Doc. 6-5, pp. 23-25). Dr. March noted that Ms. Reed's functional limitations had not worsened since Dr. Reddy's RFC assessment and that the "previous [and] new evidence in the file [was] consistent" with Dr. Reddy's RFC assessment. (Doc. 6-5, p. 25). Dr. March's physical residual functional capacity assessment mirrored Dr. Reddy's 2021 assessment. (*Compare* Doc. 6-5, pp. 9-10 *with* Doc. 6-5, pp. 23-24).

### Dr. Jesanna Cooper's Physical Evaluation

On March 9, 2023, Dr. Cooper examined Ms. Reed. (Doc. 6-15, pp. 63-65).[29] Ms. Reed reported that after a car accident in 2021, her neck and back pain, chronic anxiety, and panic attacks "became so severe that she could no longer function as expected." (Doc. 6-15, p. 64). Ms. Reed indicated that her pain was most severe in the morning, that her neck and back pain were worse on her left side, that pain shot down the left side of her neck to her left shoulder, and that her back pain radiated to her legs and caused tingling and numbness in both legs. (Doc. 6-15, p. 64). She reported daily headaches and leg swelling that improves with walking. (Doc. 6-15, p. 64). Ms. Reed stated that her psychiatric medications controlled her anxiety, but when she was "off medication," she had "multiple panic attacks a day." (Doc. 6-15, p. 65).

---

[29] The record is unclear at whose request Dr. Cooper examined Ms. Reed.

Ms. Reed had tenderness to palpation in her facet joint, tenderness over the trapezius muscle, and decreased extension and leftward rotation due to pain in her neck; lumbar "step offs" at L4-S1, pain with decreased extension and rotation in her lumbar spine and tenderness to palpation in her lumbar spine, bilateral SI joints, and paraspinal muscles; and normal range of motion in her arms and legs. (Doc. 6-15, p. 65). Dr. Cooper wrote:

> Impression: 42Y with low back pain due to bulging disc L5-S1 and neck pain due to cervical spinal instability. Her symptoms date back to 2013 with dramatic worsening in 2021 following a MVA. Her spinal joint disease [was] associated with chronic muscle spasm and radiculopathy which contribute[ed] significantly to her pain and extremity numbness and tingling. Her symptoms limit[ed] her ability to perform functions of daily living as she [was] required to change positions and rest almost continuously. She ha[d] tried medical and chiropractic care without improvement and [was] likely to continue having these symptoms for the foreseeable future.

(Doc. 6-15, p. 65).

On March 9, 2023, Dr. Cooper completed a physical capacities form. (Doc. 6-15, p. 63). Dr. Cooper opined that Ms. Reed could sit for two hours at one time; could stand for less than 15 minutes; would be expected to lay down, sleep, or sit with her legs propped at waist level for four hours in an eight-hour workday; would be off task 50% in an eight-hour workday; and would be expected to be absent from work seven days a month. (Doc. 6-15, p. 63). Dr. Cooper listed as side effects of Ms. Reed's medications "insomnia, somnolence, constipation, and diarrhea." (Doc. 6-15, p. 63). Dr. Cooper indicated that Ms. Reed's limitations dated to May 10, 2021

and were based on Ms. Reed's "spondylosis, DJD, degenerative arthritis, anxiety, [and] depression." (Doc. 6-15, p. 63).

### *Dr. June Nichols's Consultative Mental Examination*

On August 10, 2023, after the ALJ's decision and before the Appeals Council's denial of review, at the request of Ms. Reed's attorney, licensed psychologist Dr. Nichols examined Ms. Reed. (Doc. 6-3, pp. 17-27). Dr. Nichols noted that Ms. Reed's attorney provided "extensive background medical and psychiatric records" for review. (Doc. 6-3, p. 17). Dr. Nichols summarized Ms. Reed's medical records. (Doc. 6-3, pp. 17-22).

Ms. Reed reported problems reading and spelling and indicated that she was in special education throughout school. (Doc. 6-3, p. 22). She stated that was 16 years old in seventh grade and quit school before she started eighth grade. (Doc. 6-3, p. 22). She reported a traumatic childhood with parents who were drug addicts and exposure to drug dealers and guns. (Doc. 6-3, p. 22). Ms. Reed stated that she married when she was 18 years old, that she and her husband had been separated for several years, and that she had always had custody of their two children. (Doc. 6-3, p. 22). Ms. Reed indicated that she lived with her aunt who took care of the bills and whatever needed to be done. (Doc. 6-3, p. 23).

Ms. Reed reported crying spells; depressed mood; trouble sleeping; feelings of panic and loss of control; irritability; anxiety in social settings; emotional distance

from others; inability to complete tasks; racing thoughts; and trouble remembering and following instructions, concentrating, and working with supervisors and peers. (Doc. 6-3, p. 23). Ms. Reed stated that she had panic attacks two to three times a month; her panic attacks were worse if she had to "be out a lot." (Doc. 6-3, p. 22). She did not like crowds, loud noises, arguments, and the inability to see the exits in a building, and she felt uncomfortable if someone unexpectedly approached her. (Doc. 6-3, p. 22). Ms. Reed reported that she was not involved in community activities or clubs and had no friends. (Doc. 6-3, p. 23).

Dr. Nichols noted that Ms. Reed was well-groomed and had good eye contact, clear speech, and a dysthymic mood and affect. (Doc. 6-3, p. 22). Ms. Reed had good judgment and insight, clear stream of consciousness, slowed conversation pace, fair mental processing, and grossly intact memory. (Doc. 5-3, p. 88). Ms. Reed had poor general fund of knowledge; she did not know the name of the United States President, Alabama Governor, number of weeks in a year, or number of states in the United Sates. (Doc. 6-3, p. 23). Dr. Nichols administered the similarities and information subtests on the Wechsler Adult Intelligence Test. (Doc. 6-3, p. 23). Ms. Reed scored an "8" on the similarities subtest and a "3" on the information subtest, which yielded a "Prorated Verbal Comprehension Index Score of 76," which Dr.

Nichols's opined put Ms. Reed in the fifth percentile in verbal comprehension. (Doc. 6-3, p. 23).[30]

Dr. Nichols diagnosed Ms. Reed with post-traumatic stress disorder; major depressive disorder, recurrent severe, without psychotic features; generalized anxiety disorder; specific learning disorder with impairments in reading and written expression, and borderline intelligence. (Doc. 6-3, p. 26). Dr. Nichols explained that Ms. Reed met the diagnostic criteria for post-traumatic stress disorder because of the "ongoing trauma of her childhood." (Doc. 6-3, p. 24). Dr. Nichols assessed Ms. Reed's depressive disorder as severe in part because doctors had prescribed

---

[30] "The Wechsler Adult Intelligence Scale serves as a comprehensive tool in psychological assessment, specifically designed to measure the intelligence of adults." The WAIS-IV assesses adult intelligence through four primary indices: the verbal comprehension index, the perceptual reasoning index, the working memory index, and the processing speed index. The verbal comprehension index includes four tests:

- Similarities: Abstract verbal reasoning (e.g., "In what way are an apple and a pear alike?")
- Vocabulary: The degree to which one has learned and been able to comprehend and verbally express vocabulary (e.g., "What is a guitar?")
- Information: Degree of general information acquired from culture (e.g., "Who is the president of Russia?")
- Comprehension [Supplemental]: Ability to deal with abstract social conventions, rules, and expressions (e.g., "What does Kill two birds with one stone metaphorically mean?")

*See*    https://www.mentalhealth.com/library/wechsler-adult-intelligence-scale-psychological-testing (last visited Mar. 20, 2025). A verbal comprehension index score of 76 falls in the "low" category    and    fifth    percentile    ranking.    *See* http://materials.ndrn.org/virtual20/session16/Special%20Education%20Records%20Review/Understanding%20Evaluation%20Scores%20NDRN.pdf (last visited Mar. 20, 2025).

several different psychiatric medications over 13 years, but Ms. Reed "continue[d] to experience symptoms." (Doc. 6-3, p. 25).

Dr. Nichols opined that Ms. Reed could understand short, simple spoken instructions but not written instructions; would likely have difficulty remembering short, simple instructions because of her "functioning level," anxiety, and deficits in concentration, persistence, and pace; could not maintain concentration or pace for at least two hours and be punctual within customary tolerances; could sustain an ordinary routine without special supervision; could adjust to routine and infrequent work changes; could not interact with supervisors and/or co-workers because of anxiety and post-traumatic stress disorder; and could maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Doc. 6-3, p. 26). Dr. Nichols stated that Ms. Reed would be off task for 25-30% of an eight-hour workday, and she would likely not show up for work ten days in a 30-day period. (Doc. 6-3, p. 26). Dr. Nichols noted that Ms. Reed's limitations dated to April 10, 2021. (Doc. 6-3, p. 26).[31]

On August 27, 2023, Dr. Nichols completed a one-page mental health source statement in which she included the same limitations for Ms. Reed. (Doc. 6-3, p.

---

[31] Ms. Reed noted in her brief that April 10, 2021 "appears to be a typo" because her motorcycle accident occurred on May 10, 2021, not April 10, 2021. (Doc. 11, p. 14, n. 3). In the August 27, 2023 medical source statement, Dr. Nichols indicated that Ms. Reed's limitations dated to "5/10/21." (Doc. 6-3, p. 16).

16).  Dr. Nichols indicated that the limitations dated to May 10, 2021.  (Doc. 6-3, p.

16).  Dr. Nichols based her medical source statement on her "professional experience

with Ms. Reed."  (Doc. 6-3, p. 16).

### Ms. Reed's Function Report

At the request of the Social Security Administration, Ms. Reed completed an

adult function report.  (Doc. 6-9, pp. 37-44).[32]  Ms. Reed stated that she did not take

care of anyone else and did not care for pets.  (Doc. 6-9, p. 38).  She indicated that

she sat around most of the day in pain and that she had pain when she bent to dress,

sat to bathe, and raised her arms to care for her hair.  (Doc. 6-9, p. 38).  Ms. Reed

stated that she prepared simple meals; did not cook because she had pain standing;

did not do house or yard work because of pain; sometimes went outside; rode in a

car and drove; "hardly ever" shopped in stores; and could pay bills, count change,

handle a savings account, and use a checkbook.  (Doc. 6-9, pp. 39-40).  Ms. Reed

stated that she loved to fish but could not anymore because of her impairments, did

not spend time with others, did not go anywhere, did not go places by herself because

of panic attacks, and had problems getting along with her daughter.  (Doc. 6-9, p.

41).

---

[32]  Ms. Reed mistakenly dated her function report "05-28-80," which is her date of birth.  (Doc. 6-9, pp. 10, 44, 45).

Ms. Reed reported that her constant hip and back pain and trouble sleeping limited her ability to work.  (Doc. 6-9, pp. 37-38).  Ms. Reed took Prozac, Klonopin, and gabapentin.  (Doc. 6-9, p. 44).  She stated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands.  (Doc. 6-9, p. 42).  Ms. Reed indicated that she could walk a half of a block before she need to rest for 10 minutes, could pay attention for 20 minutes, did not finish what she started, could not follow written or spoken instructions well, and could not handle stress because it caused panic attacks.  (Doc. 6-9, pp. 42-43).

On April 25, 2022, Ms. Reed completed another adult function report.  (Doc. 6-9, pp. 62-69).  She reported the same limitations as in her previous function report.  Ms. Reed stated that she did not finish school, had a "really bad" learning disability, and was in "special class for help" in school.  (Doc. 6-9, p. 69).  Ms. Reed stated that her back and hip pain and panic attacks prevented her from working.  (Doc. 6-9, p. 62).  Ms. Reed indicated that she could not babysit because of her impairments.  (Doc. 6-9, p. 63).  She stated that she tried to wash dishes, but it took her a long time because of pain; her hobbies included coloring, puzzles, and watching television.  (Doc. 6-9, pp. 64, 66).  Ms. Reed stated that she hung out with others in person, on the phone, and via text and video chat once or twice a month but could not do much with others because of her impairments.  (Doc. 6-9, p. 66).  She indicated that she sometimes needed someone to accompany her when she went places.  (Doc. 6-9, p.

66).  Ms. Reed stated she could lift 15 pounds and could not squat or bend because of pain.  (Doc. 6-9, p. 67).  Ms. Reed indicated that she did not get along well with bosses because if she messed up or did something wrong, she would have a panic attack.  (Doc. 6-9, p. 67).  Her panic attacks were "bad" and "way worse."  (Doc. 6-9, pp. 68, 69).  Ms. Reed indicated that Klonopin sometimes caused drowsiness.  (Doc. 6-9, p. 69).

### *Ms. Reed's Husband's Third-Party Function Report*

On August 8, 2021, Johnny Reed, Ms. Reed's husband, completed an adult third-party function report.  (Doc. 6-9, pp. 29-36).  Mr. Reed reported that Ms. Reed had the limitations included in Ms. Reed's function report.  Mr. Reed indicated that Ms. Reed had panic attacks "all the time" and could not cook for her family, babysit her grandbaby, or work because of her impairments.  (Doc. 6-9, p. 30).  Mr. Reed stated that he helped Ms. Reed get out of bed and helped with her personal care when necessary.  (Doc. 6-9, p. 30).  He indicated that Ms. Reed tried to help with laundry, but it took her several hours.  (Doc. 6-9, p. 31).  Mr. Reed indicated that Ms. Reed could go out alone but did not because she was scared that she would wreck the car and would have panic attacks.  (Doc. 6-9, p. 32).  He stated that Ms. Reed sometimes drove if someone was with her but that she did not "go anywhere by herself."  (Doc. 6-9, pp. 32, 34-35).  Mr. Reed indicated that Ms. Reed followed spoken instructions "ok" and got along well with authority figures.  (Doc. 6-9, pp. 34-35).

*Administrative Hearing*

The ALJ held Ms. Reed's administrative hearing on April 10, 2023. (Doc. 6-4, pp. 2-25). Ms. Reed testified that she was 42-years-old, completed the tenth grade, and lived with her aunt. (Doc. 6-4, p. 7). Ms. Reed reported that she "experienced periods of homelessness" after her May 2021 car accident. (Doc. 6-4, p. 19). She indicated that she did not read well, could write, had a hard time with "more difficult" addition and subtraction, could make change for a $20 bill, and could pay bills. (Doc. 6-4, p. 8).

Ms. Reed stated that she was in a car accident on May 9, 2021 and last worked on that date. (Doc. 6-4, pp. 8, 11). She indicated she could not work because of back and hip pain, anxiety, panic attacks, and leg and feet swelling. (Doc. 6-4, pp. 10-11, 13). Ms. Reed stated that she received three epidural injections that did not help her back pain, that a new "back doctor" was supposed to refer her to pain management, and that her doctor said that surgery would not help. (Doc. 6-4, pp. 11, 16). Ms. Reed testified that Medicaid was preventing her from receiving pain management and seeing a new orthopedic doctor. (Doc. 6-4, p. 16). She explained that Medicaid allowed only 14 total medical visits each year, and with the number of different doctors from which she sought treatment, "there [was] just not enough visits to go to everyone in one year." (Doc. 6-4, pp. 16-17).

Ms. Reed stated that muscle relaxers did not help, she took Goody's powder every day, and her gabapentin prescription was "on a hold" because her doctor was "moving locations." (Doc. 6-4, pp. 11-13). She stated that she did not sleep well because of her constant pain. (Doc. 6-4, p. 19). Because of the swelling in her feet, Ms. Reed wore slides to the hearing because the slides "ma[d]e her feet and legs feel better," and tennis shoes squeezed her feet and made her pain worse. (Doc. 6-4, p. 17). Ms. Reed testified that she propped up her feet four to five hours a day because of swelling. (Doc. 6-4, pp. 17-18).

Ms. Reed testified that she could walk for five to ten minutes, stand and sit for five minutes, could not pick up a gallon of milk or a bag of potatoes, could walk a set of stairs slowly, could bend over, could not stoop or squat if her legs were swollen, and had no manipulation limitations. (Doc. 6-4, pp. 13-15). She could make simple meals but could not stand long to cook a full meal, could bathe and dress without assistance, and could not do house cleaning; her aunt did the housework. (Doc. 6-4, pp. 15-16). Ms. Reed testified that during the day, she alternated between sitting and standing; if her back hurt while she sat, she would stand for a minute and then sit down. (Doc. 6-4, p. 16).

Ms. Reed testified that her anxiety was "through the roof" and indicated that she was going to have a panic attack during the administrative hearing. (Doc. 6-4, p. 13). She stated that her anxiety and depression were more severe after her May

2021 car accident. (Doc. 6-4, p. 18). She stated that she was nervous around people; had difficulty talking to, being around, and getting along with others; was fidgety; and had sweaty hands. (Doc. 6-4, pp. 13, 19). Ms. Reed testified that she could only go to a store for a "few minutes" because of her anxiety. (Doc. 6-4, p. 14). Ms. Reed indicated that she had a driver's license but did not drive because of her anxiety. (Doc. 6-4, pp. 14, 18). Ms. Reed indicated that Prozac and Klonopin helped her anxiety symptoms, but her doctor had to increase her medications from one to three daily. (Doc. 6-4, pp. 11, 18).

William Kiger testified as a vocational expert at Ms. Reed's administrative hearing. (Doc. 6-4, p. 19). Mr. Kiger classified Ms. Reed's past work as a housekeeper cleaner as light work but performed at the medium exertional level; a nurse assistant as medium work but performed at the heavy exertional level; and a production assembler as light work. (Doc. 6-4, p. 21). The ALJ asked Mr. Kiger to assume a hypothetical individual with the same age, education, and work experience as Ms. Reed with the following limitations:

> [could] lift and carry 20 pounds occasionally [and] ten pounds frequently[;] [could] sit, stand[,] and walk six hours each during an eight-hour workday[;] [could] push and pull as much as lift and carry[;] [could] climb ramps and stairs frequently[;] should never climb ladders, ropes[,] or scaffolding[;] [could] balance frequently[;] [could] stoop, kneel, crouch[,] and crawl occasionally[;] [] should not work at unprotected heights[;] [] would be restricted to simple, routine tasks[;] [and could] have occasional contact with coworkers, supervisors[,] and the general public.

48

(Doc. 6-4, p. 21). Mr. Kiger testified that the individual could perform Ms. Reed's past work as a production assembler and as a housekeep cleaner but at the light exertional level with 175,000 available jobs nationally. (Doc. 6-4, p. 22). Ms. Reed also could perform light, unskilled work as a routing clerk with 117,000 available jobs nationally and as a marker with 120,000 available jobs nationally. (Doc. 6-4, p. 22).

In the ALJ's second hypothetical, she asked Mr. Kiger to assume the same limitations as the first hypothetical except the individual would be off task at least 20% of the workday because of pain. (Doc. 6-4, p. 22). Mr. Kiger testified that limitation would preclude all work because employers would tolerate "no more than 15%" off-task behavior. (Doc. 6-4, pp. 22-23).

Mr. Kiger testified that the general rule for absenteeism is no more than one day per month. (Doc. 6-4, p. 23). Mr. Kiger stated that no competitive work was available for an individual who could not maintain attention, concentration, and pace for at least two hours; could not interact with coworkers or supervisors; or had to prop her legs at waist level for four hours in an eight-hour workday. (Doc. 6-4, pp. 23-24).

## ALJ DECISION

On April 27, 2023, the ALJ issued an unfavorable decision. (Doc. 6-3, pp. 81-94). The ALJ found that Ms. Reed had not engaged in substantial gainful activity

from her alleged onset date of May 10, 2021 through her date last insured.  (Doc. 6-3, p. 83).[33]  The ALJ determined that Ms. Reed suffered from the severe impairments of depression, panic disorder, and cervical spinal instability and the non-severe impairments of asthma, iron deficiency, cysts, and abdominal pain.  (Doc. 6-3, pp. 83-84).  Based on a review of the medical evidence, the ALJ concluded that Ms. Reed did not have an impairment or a combination of impairments that met or medially equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 84).

Considering Ms. Reed's impairments, the ALJ evaluated Ms. Reed's residual functional capacity.  (Doc. 6-3, p. 86).  The ALJ determined that Ms. Reed had the RFC to perform:

> light work . . . except [she could] climb ramps and stairs frequently[;] [could] never climb ladders, ropes, or scaffolds; [could] frequently balance and occasionally stoop, knee[l], crouch, and crawl; [could] never work at unprotected heights; [could] perform simple, routine tasks; and [could] occasionally interact with supervisors, co-workers, and the public.

(Doc. 6-3, p. 86).

---

[33]  A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A).  If a claimant becomes disabled after her insured status expires, the ALJ must deny the disability insurance benefits claim.  Ms. Reed's date last insured is September 30, 2025.  (Doc. 6-3, p. 83).

Based on this RFC and relying on testimony from Mr. Kiger, the ALJ concluded that Ms. Reed could perform her past relevant work as a production assembler. (Doc. 6-3, p. 91). Relying on testimony from Mr. Kiger, the ALJ also found that other jobs existed in significant numbers in the national economy that Ms. Reed could perform, including routing clerk, housekeeping cleaner, and marker. (Doc. 6-3, p. 92). Accordingly, the ALJ determined that Ms. Reed was not disabled as defined by the Social Security Act. (Doc. 6-3, p. 93).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *T-Mobile*

51

*South, LLC* v. *Roswell*, 574 U.S. 293, 301 (2015), and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (quoting *Consolidated Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2015) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. That review is *de novo*. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Reed contends that the ALJ improperly evaluated the opinions of several consultative doctors who offered opinions regarding mental and physical limitations. (Docs. 11, 22). Among other things, Ms. Reed argues that substantial evidence does not support the ALJ's treatment of Dr. Roque and Dr. Jesanna Cooper's opinions regarding monthly absences. (Doc. 11, pp. 4-7, 21-22, 29-33; Doc. 22, pp. 4-6). Ms. Reed also argues that the ALJ improperly evaluated the persuasiveness of some of Dr. Gloria Roque's and Dr. Amy Cooper's assessed mental limitations because they were not in "vocationally relevant terms." (Doc. 11, pp. 22-23; Doc. 22, pp. 6-17).[34]

An ALJ must consider five factors when evaluating the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5); *see Harner v. Social Security Admin., Comm'r*, 38 F.4th 892, 897 (11th Cir. 2022). The most important factors are supportability and consistency, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] determination or decision." 20 C.F.R. § 416.920c(b)(2).[35] When considering the supportability of a medical opinion, "[t]he

---

[34] To avoid confusion, the Court will refer to "Dr. Cooper" when discussing Dr. Amy Cooper's opinion and to "Dr. Jesanna Cooper" when discussing her opinion.

[35] An ALJ does not have to articulate how she considered the other three factors. 20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in

more relevant the objective medical evidence and supporting explanations presented by a medical source are . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1).  And when considering the consistency of a medical opinion, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be."  20 C.F.R. § 416.920c(c)(2).

Here, the ALJ stated generally that she "fully considered the medical opinions and prior administrative medical findings" in accordance with the requirements of 20 C.F.R. § 416.920c.  (Doc. 6-3, p. 90).  With respect to Dr. Roque's and Dr. Cooper's opinions, the ALJ stated:

> The State agency psychological consultants determined that the claimant could perform simple work and had no more than moderate limitations due to the anxiety and panic attacks.  They opined she would miss 1-2 days of work per month due to panic. . .  While the evidence certainly shows the claimant can perform simple work, there is no evidence to support the absenteeism.  Furthermore, the consultants included limitations that are not phrased in vocationally relevant terms.  For example, the statement that the claimant's feedback should be supportive and encouraging does not pertain to any vocational description in the Dictionary of Occupational Titles or its companion publications, such as the Selected Characteristics of Occupations.  Presumably, every worker would prefer a supportive and encouraging work environment, but the personality and management style of a worker's supervisor is not an aspect of the circumstances of employment that could realistically be covered by the Administrative Law Judge or vocational expert in the context of a disability hearing.

paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

54

>The undersigned has considered the effect the claimant's impairments
>on her ability to perform the mental requirements of work as set out in
>SSR 85-15.  This ruling notes that an individual should be able to
>understand, carry out, and remember simple instructions; to respond
>appropriately to supervision, coworkers[,] and usual work situations;
>and to deal with changes in a routine work setting.  Thus, these are the
>activities the undersigned considered in reaching the claimant's
>residual functional capacity (Exhibits 1A and 3A).

(Doc. 6-3, p. 90).

Regarding Dr. Roque's and Dr. Cooper's opinions that Ms. Reed would miss one to two days of work each month because of her panic disorder, the ALJ explained that there was "no evidence to support the absenteeism" limitation.  (doc. 6-3, p. 90).  In other words, the ALJ found that the absenteeism limitation was inconsistent with Ms. Reed's medical record.  Ms. Reed asserts that Dr. Roque and Dr. Cooper "expressly tied their absenteeism limitation to the incidence of [Ms. Reed's] panic attacks" and that Ms. Reed's medical records support their opinion. (Doc. 11, p. 30).  Ms. Reed argues that Dr. Roque's and Dr. Cooper's opinions regarding absences of one to two days per month are significant because the VE testified that more than one absence on a consistent basis could preclude Ms. Reed from competitive work.  (Doc. 6-4, p. 23; Doc. 11, p. 31).[36]

---

[36] The ALJ did not pose a hypothetical that included the limitation that Dr. Roque and Dr. Cooper found—missing one to two days a month.  (Doc. 6-4, pp. 20-24).

Though the ALJ did not explain how Dr. Roque and Dr. Cooper's opinion regarding monthly absences were inconsistent with the medical evidence, the Commissioner urges the Court to look to the ALJ's decision as a whole in assessing whether substantial evidence supports the ALJ's assessment of Dr. Roque's and Dr. Cooper's opinion and decision to exclude monthly absences from Ms. Reed's RFC.[37] The Commissioner asserts that "[w]hen evaluating opinions by [CRNP] Garrard and Dr. Bynum, the ALJ [] explained why limitations to simple work had a basis in the record but absenteeism did not, and [the ALJ] did not have to summarize the evidence again." (Doc. 19, p. 8). The Commissioner cites *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1275-76 (11th Cir. 2024), for the proposition that "'it is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analysis at multiple points in the decision." (Doc. 19, p. 9).[38] So, the Commissioner argues that because the ALJ

---

[37] When discussing Dr. Roque's and Dr. Cooper's opinion, the ALJ did not cite evidence that was inconsistent with Dr. Roque's or Dr. Cooper's opinion and did not elaborate on her conclusion that there was no evidence in the record to support the finding that Ms. Reed would miss one to two days of work per month because of panic disorder. Consequently, the Court cannot tell what evidence the ALJ had in mind that was inconsistent with Dr. Roque's and Dr. Cooper's opinions regarding absenteeism because of her panic disorder, and the ALJ did not meet her regulatory obligation to explain the supportability and consistency of Dr. Roque's and Dr. Cooper's opinions regarding monthly absences from work. *Pierson v. Comm'r of Soc. Sec.*, No. 6-19-cv-01515, 2020 WL 1957597, at *4 (M.D. Fla. Apr. 8, 2020) (the "new regulations require an explanation, even if the ALJ believe[s] an explanation is superfluous").

[38] The Court in *Raper* applied the former treating physician's rule in which the ALJ had to state explicitly the weight given to a treating physician's opinion and did not address the ALJ's duty under § 416.920c to explain the consistency and supportability of all medical opinions. *Raper*, 89 F.4th at 1274. The Court in *Raper* "emphasize[d] that there [were] no magic words to state with

discussed Ms. Reed's normal mental examinations and daily activities when she rejected CRNP Garrard's absenteeism limitation and found persuasive Dr. Bynum's opinion that did not include an absenteeism limitation, those same reasons provide substantial evidence for the ALJ's finding that no evidence supported Dr. Roque's and Dr. Cooper's opinions that Ms. Reed would miss one to two days of work a month because of her panic disorder.  The Court is not persuaded.

The ALJ, in discussing CRNP Garrard's opinion that Ms. Reed would be off task 20% of the workday and would miss two days of work a month, stated that opinion was "not persuasive in light of [CRNP Garrard's] treatment notes (she can hold attention, etc.)."  (Doc. 6-3, p. 88).  The ALJ stated that Ms. Reed's mental health providers consistently noted normal attention, concentration, thought process, insight, and judgment.  (Doc. 6-3, pp. 87, 88, 89).  The ALJ cited Ms. Reed's normal mental examinations, but Ms. Reed's normal insight and judgment and ability to concentrate and pay attention during mental health appointments does not necessarily mean that she would not miss one to two days of work per month because of her panic disorder.  *See Meade v. Comm'r of Soc. Sec.,* 807 Fed. Appx. 942, 949-50 (11th Cir. 2020) ("ALJ Colon's reliance on Meade's normal speech, euthymic

_____

particularity the weight given to medical opinions or the reasons for discounting them.  What matters is whether the ALJ state[s] with at least some measure of clarity the grounds for his [or her] decision.  *Raper*, 89 F4th at 1276 n. 14 (citing *Winschel*, 631 F.3d at 1179).

affect, lack of psychosis, linear thought processes, and normal cognitive functions []
do not support the assignment of little weight to Dr. Nardon's opinion because ALJ
Colon did not provide any reason why those evaluations were inconsistent with
Meade's ability to reliably leave her house or remain at work due to her panic
disorder and agoraphobia, which intermittently but consistently incapacitated her.").

Dr. Roque and Dr. Cooper based their opinions regarding absenteeism on the
fact that Ms. Reed suffered severe panic attacks even though she took psychiatric
medications, and panic attacks would affect Ms. Reed's ability to work one to two
times a month. Nurse Garrard consistently reported that Ms. Reed had an anxious
mood and affect during medical visits. (Doc. 6-14, pp. 60, 63; Doc. 6-19, pp. 71,
78, 83, 86). The ALJ did not address the consistency of Dr. Roque's and Dr.
Cooper's opinions with CRNP Garrard's and Dr. Jesanna Cooper's opinions
regarding absenteeism; all four medical providers agreed that Ms. Reed would miss
at least one to two days of work a month because of her impairments.

Dr. Roque's and Dr. Cooper's opinions regarding absences, based on their
assessment of Ms. Reed's medical records, are consistent with CRNP Garrard's
opinion that Ms. Reed would miss more than two days a month because of her
psychiatric symptoms and with Dr. Jesanna Cooper's opinion that Ms. Reed would
miss more than two days a month based on Ms. Reed's physical and mental
limitations. (Doc. 6-13, pp. 98; Doc. 6-15, p. 63; Doc. 6-19, p. 70). Dr. Roque and

Dr. Cooper tied Ms. Reed's monthly absences to her panic disorder, and the ALJ found Ms. Reed's panic disorder was a severe impairment. (Doc. 6-3, p. 83). Ms. Reed reported severe, recurring panic attacks to Nurse Garrard in 2020, 2021, 2022, and 2023. (Doc. 6-14, pp. 60, 63, 66, 72, 75; Doc. 6-19, pp. 71, 74, 77, 80). Ms. Reed told Nurse Garrard in May 2022 that she had "a lot of anxiety and panic attacks." (Doc. 6-19, p. 77). Ms. Reed reported panic attacks to Dr. Doblar in July 2021, to Dr. Nesbitt in April 2022, and to Dr. Juneja in May 2023. (Doc. 6-3, p. 13; Doc. 6-14, p. 12; Doc. 6-15, p. 14). In November 2021, Ms. Reed reported to Dr. Bynum that that she had panic attacks "once to twice a month" despite taking Prozac and Klonopin; Dr. Bynum diagnosed panic disorder without agoraphobia. (Doc. 6-14; pp. 80-81, 82). In March 2023, Ms. Reed told Dr. Jesanna Cooper that the panic attacks were worse after a 2021 car accident and that she had "multiple panic attacks a day" if she did not take her psychiatric medications. (Doc. 6-15, pp. 64-65).[39]

Ms. Reed stated in her function reports that she did not go places by herself or handle stress because of her panic attacks. (Doc. 6-9, pp. 41-43, 68-69). Ms. Reed's husband reported in August 2021 that Ms. Reed had panic attacks "all the time" and would not go out alone for fear of having a panic attack. (Doc. 6-9, pp. 30, 32). Ms. Reed testified at the April 2023 administrative hearing that she felt like

---

[39]  Ms. Reed also told Dr. Nichols in August 2023 that she had two to three panic attacks each month and that her panic attacks were worse if she went places "a lot." (Doc. 6-3, p. 22).

she was going to have a panic attack at the hearing and that during a panic attack, she was nervous, had difficulty talking to and being around people, was fidgety, and had sweaty hands. (Doc. 6-4, p. 14). Substantial evidence in the record does not support the ALJ's finding that no evidence in the record supported Dr. Roque's and Dr. Cooper's opinion that Ms. Reed would miss one to two days of work a month because of her severe panic attacks.

Ms. Reed also argues that the ALJ improperly declined to incorporate some portions of Dr. Roque's and Dr. Cooper's opinions into Ms. Reed's RFC because the limitations "were not phrased in vocationally relevant terminology." (Doc. 11, pp. 22-23; Doc. 22, pp. 6-17). The ALJ found that the limitation regarding supportive and encouraging feedback from supervisors was a "personality and management style of a worker's supervisor" that an ALJ or vocational expert could not include "realistically" in Ms. Reed's RFC. (Doc. 6-3, p. 90). Ms. Reed argues that ALJs regularly include "supportive feedback" as a vocational limitation in RFCs and cites to 26 federal cases in which an ALJ included "supportive feedback" as a limitation in the claimant's RFC. (Doc. 22, pp. 7-10) (citing cases).[40] The Court

---

[40] Ms. Reed cites the following cases:

*Holder v. Social Security Administration*, 771 Fed. Appx. 896, 898 (11th Cir. 2019) ("Holder could tolerate contact 'with a few supportive coworkers' and 'non-confrontational' feedback."); *Nance v. Saul*, 781 Fed. Appx. 912, 916 (11th Cir. Jul. 18, 2019) (""[Nance] can accept supportive feedback"); *Turner v. Kijakazi*, 3:21-cv-756-KFP, 2023 WL 2583272, *4 (M.D. Ala. Mar. 20, 2023) ("the ALJ adopted a stricter limitation by restricting Plaintiff to infrequent interaction with others and supportive feedback."); *Gordin v. Commissioner of Social Security Administration*,

3:20-cv-352 p. 3, 2021 WL 4771270 (S.D. Ohio Oct. 13, 2021) ("Supervisory feedback should be given in a supportive manner."); *Sanders v. Saul*, 4:19-cv-1919-LSC, 2021 WL 1117758, * 2 (N.D. Ala. Mar. 24, 2021) ("feedback should be supportive"); *Reynolds v. Social Security Administration, Commissioner*, 4:19-cv-1941-LCB, 2021 WL 1087240, *6 (N.D. Ala. Mar. 22, 2021) ("She will have supportive feedback."); *Harrison v. Saul*, 19-cv-1466-MHH, 2021 WL 913345, *2, 6 (N.D. Ala. Mar. 10, 2021) ("will need supportive and nonconfrontational feedback"); *Lankford v. Commissioner of Social Security*, 1:17-cv-206-SKL p. 5, 2018 WL 6816064 (E.D. Tenn. Dec. 27, 2018) ("She needs nonconfrontational and supportive supervision… She can have no contact with the general public but can have contact with supervisors and a few supportive co-workers that is casual and non-intensive. Feedback should be supportive, similar to her supervision."); *Caudle v. Commissioner, Social Security Administration*, 4:17-cv-947-HNJ, 2018 WL 4184572, *2 (N.D. Ala. Aug. 31, 2018) ("Feedback should be supportive."); *Corley v. Berryhill*, 2:16-cv-19129TMP, 2018 WL 4184572, *2 (N.D. Ala. Mar. 23, 2018) ("she can accept supportive feedback"); *Massenburg v. Berryhill*, 5:16-cv-1351-LSC, 2018 WL 1210933, * 5 (N.D. Ala. Mar. 8, 2018) ("criticism and feedback from supervisors and coworkers should be casual"); *Moore v. Berryhill*, 5:16-cv-294-CJK p. 5, 2017 WL 6396132 (N.D. Fla. Dec. 14, 2017) ("The claimant could respond appropriately to supervisors, but interaction should be casual and nonconfrontational and feedback should be supportive."); *Benson v. Berryhill*, 4:16-cv-673-MHH, 2017 WL 4222608, *2 (N.D. Ala. Sept. 22 2017) ("the claimant can interact appropriately with supervisors but this should be casual non-confrontational and with supportive feedback"); *Yarbrough v. Berryhill*, 8:15-cv-4930-RBH-JDA p. 34, 2017 WL 521636 (D. S.C. Jan. 30, 2017) ("a lower stress environment with non-confrontational supervisory contact"); *Wilson v. Colvin*, 4:15-cv-641-TMP, 2016 WL 4447442 *2 (N.D. Ala. Aug. 24, 2016) ("feedback should be supportive"); *Gill v. Colvin*, 15-388-B, 2016 WL 4046788, *3 (S.D. Ala. Jul. 28, 2016) ("feedback from supervisors should be supportive"); *Sutherland v. Commissioner, Social Security Administration*, 6:15-cv-239-HGD, 2016 WL 2754538, *2 (N.D. Ala. May 12, 2016) ("Any feedback should be supportive, tactful, and non-confrontational."); *Everett v. Colvin*, 6:14-cv-2150-SLB, 2016 WL 1270618, *4 (N.D. Ala. Mar. 31, 2016) ("Any feedback should supportive, tactful, and non-confrontational"); *Thomas v. Colvin*, 2:14-cv- 1119-SCS, 2016 WL 1048525, *6 (M.D. Ala. Mar. 16, 2016) ("feedback should be supportive"); *Harris v. Commissioner, Social Security Administration*, 2:14-cv-1000-HGD, 2015 WL 7176406, *2 (N.D. Ala. Nov. 16, 2015) ("Feedback should be supportive and non-threatening"); *Bethune v. Colvin*, 2:14-cv-1068-JHE, 2015 WL 5675742, *2 (N.D. Ala. Sept. 28, 2015) ("would benefit from supportive feedback and tactful, non-confrontational criticism"); *Urtecho v. Colvin*, 5:14-cv-155-CJK p. 3, 2015 WL 5635272 (N.D. Fla. Sep. 18, 2015) ("feedback should be supportive"); *Thomas v. Colvin*, 11-569-B, 2015 WL 4458861, *3, 5 (S.D. Ala.. Jul. 21, 2015) ("Feedback should be supportive."); *Wessler-Herron v. Colvin*, 6:14-cv-840-SLB, 2015 WL 4426221, *3 (N.D. Ala. Jul. 20, 2015) ("Feedback should be supportive."); *Mobley v. Colvin*, 2:14-cv-618-WC, 2015 WL 3514603, *3 (M.D. Ala. Jun. 3, 2015) ("contact with others should involve supportive supervisory feedback"); *Pennington v. Colvin*, 2:13-cv-662-CSC, 2015 WL 471009, *4 (M.D. Ala. Feb. 3, 2015) ("Feedback should be supportive.  Feedback should be tactful and nonconfrontational.").

(Doc. 22, pp. 7-10).

has reviewed the 26 cases that Ms. Reed cites. The ALJs' inclusion of a supportive feedback limitation in the RFCs in those cases suggests that a "supportive feedback" limitation is a vocationally relevant term that an ALJ may include in a hypothetical to a vocational expert and incorporate into a claimant's RFC. Here, the omission of a supportive feedback limitation in the ALJ's hypothetical to the ALJ is significant because that limitation could eliminate or reduce the number of jobs that Mr. Kiger testified were available for Ms. Reed. *See Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2004) (a vocational expert testified that the claimant's need for a supportive supervisor "would reduce the number of cited jobs by 90%").

Because the ALJ did not provide sufficient reasoning to demonstrate that she conducted a proper legal analysis in evaluating the persuasiveness of Dr. Roque's and Dr. Cooper's opinions, remand is warranted. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (The ALJ's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); *see also Spaar v. Kijakazi*, No. 5:20-cv-94, 2021 WL 6498838, at *5, *report and recommendation adopted*, 2022 WL 141613 (S.D. Ga. Jan. 14, 2022) (concluding that error in failing to address the supportability of medical opinions could not be harmless under the new regulations where the medical opinions, if adopted as a component of the claimant's

RFC, could have resulted in the difference between performing light work and being disabled).[41]

## CONCLUSION

For the reasons discussed above, the Court finds that the ALJ did not adequately assess Dr. Roque's and Dr. Cooper's opinions, and substantial evidence does not support the ALJ's decision.  Accordingly, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 31, 2025.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[41]  Because the Court will remand based on the ALJ's improper evaluation of Dr. Roque and Dr. Cooper's opinions, the Court will not decide the other issues Ms. Reed raised in her brief.